UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Case No. 2:16-cr-141 |
| QUINCY ALEXANDER, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
(Doc. 16)

On April 11 and May 1, 2017, the court held an evidentiary hearing with regard to Defendant Quincy Alexander's motion to suppress the fruits of his September 29, 2016 encounter with officers of the Burlington Police Department ("BPD"). (Doc. 16.) Defendant argues that he was seized without reasonable suspicion of criminal activity and arrested without probable cause. The government opposes the motion and maintains that the encounter with Defendant was consensual until law enforcement developed a reasonable suspicion to detain Defendant and later probable cause to arrest him. On June 8, 2017, the court took the motion under advisement after Defendant's counsel informed the court of his decision not to file supplemental briefing.

Defendant is charged in a two-count Indictment with knowingly and intentionally possessing cocaine base with an intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and with possessing a firearm having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1).

The government is represented by Assistant United States Attorneys Michael P. Drescher and John J. Boscia. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

## I. Findings of Fact.

On September 28, 2016 at approximately 5:00 p.m., BPD responded to a report of a drive-by shooting at a multi-unit residence located at 31 Hyde Street in Burlington, Vermont. Witnesses reported seeing an African-American male with a large build making cell phone calls outside the building immediately prior to the shooting.

BPD officers subsequently found three bullet holes in the 31 Hyde Street building, one penetrating the front door of unit #7 on a trajectory towards unit #6, one lodged in an interior wall also on a trajectory towards unit #6, and a third in a second floor wall, just inches from an unoccupied crib where an infant usually sleeps. The trajectory for this third bullet also passed in close proximity to unit #6. There were no reported injuries. BPD officers identified the occupants of unit #6 as Darren McCray, Shelly Sanders, Leon Delima, David Rosario, and Chelsea Barber. They were aware of two recent assault and robberies at unit #6.

A female who lived across the street from 31 Hyde Street stated that she had witnessed the drive-by shooting. She reported that three to four gunshots were fired from the passenger side of a maroon colored 2015 Ford Escape with tinted windows. Through a partially lowered driver's side window she saw a male operator of unknown age and race before the vehicle sped off. Because she worked in the automotive industry, she advised that she was very sure of the make, model, and year of the vehicle. She was also certain the vehicle did not have Vermont license plates, but she was less certain of the issuing state. She stated that the vehicle's out-of-state "colored" plates may have been from either Pennsylvania or New York. In response to her report, BPD disseminated a "be on the lookout" ("BOL") for a vehicle matching the description she provided.

On the morning of September 29, 2016, BPD held a briefing on the drive-by shooting in which the BOL and details of the shooting were disseminated. Detective Dwayne Mellis was among the BPD officers tasked with canvassing local hotel parking areas, mall parking lots, and parking garages for a vehicle matching the BOL description. On the same day of the briefing, he located a vehicle that appeared to match the BOL description on the second level of a parking garage attached to a downtown Burlington

mall that included a Macy's department store (the "Macy's garage"). The vehicle in question was a maroon Ford Escape with rear tinted windows and Illinois plates. Detective Mellis called BPD dispatch for a records check and determined that the vehicle was a 2016 Ford Escape registered to Hertz Rental Car. Although the vehicle was unoccupied when he first discovered it, he later observed an African-American male enter the vehicle. He contacted BPD Sergeant Paul Petralia to report the apparent vehicle match and the Illinois plate number, and then left his location to continue his canvass.

Sergeant Petralia proceeded to the Macy's garage apparently dressed in plain clothes[1] and carrying a holstered firearm. He arrived in an unmarked vehicle and parked a short distance away from the Ford Escape which was parked nose-in facing a guardrail. Sergeant Petralia ran the vehicle's plate number and determined that it belonged to a rental company. He noted that a male was seated in the driver's seat. He conferred with BPD Lieutenant Michael Warren by cell phone and they formulated a plan to make contact with the operator after Lieutenant Warren arrived on the scene.

Minutes later Lieutenant Warren arrived in an unmarked vehicle at the Macy's garage dressed in plain clothes with a holstered and concealed firearm. For safety reasons, he and Sergeant Petralia decided to approach on either side of the Ford Escape with Sergeant Petralia approaching the passenger side while Lieutenant Warren approached the driver's side. When he reached the vehicle, Sergeant Petralia knocked on the passenger-side window, displayed his badge, and said words to the effect of: "We're the police. Could you roll down your window?" In response, Defendant rolled down the vehicle's windows, whereupon both Sergeant Petralia and Lieutenant Warren smelled the strong odor of burnt marijuana.[2] From his vantage point, Lieutenant Warren observed a

---

[1] The government's opposition states that Sergeant Petralia was in plain clothes but it did not elicit this testimony in its direct examination. The evidence nonetheless supports a reasonable inference that he was in plain clothes in light of the fact that he needed to announce himself and flash his badge in order to alert Defendant to his status as a police officer.

[2] Both officers credibly testified that they were familiar with the odor of burnt marijuana. Sergeant Petralia has served on the BPD for over twenty years and is a supervisor within the department's Drug Unit. Lieutenant Warren has served with the BPD since June 1998 and was assigned to the Drug Enforcement Agency Task Force from 2003 to 2007. In addition, although

3

large pile of currency on the driver's side floor near Defendant's feet and two cell phones, one in Defendant's hand and the other on the passenger's seat.

Lieutenant Warren asked Defendant if he would mind speaking to them outside the vehicle and Defendant consented by exiting the Ford Escape. Once outside the vehicle, Lieutenant Warren asked Defendant if he could pat him down for weapons. In response, Defendant raised his hands in the air and said something to the effect of "wow, okay." No weapons or contraband were detected on his person.

The BPD officers advised Defendant that they were investigating a drive-by shooting and that there was a BOL for the vehicle involved which matched Defendant's vehicle. They asked Defendant for identification and he produced a New York operator's license identifying him as "Quincy Alexander." Sergeant Petralia immediately recognized Defendant's name as being associated with a December 27, 2015 fatal shooting on Church Street in Burlington. Defendant was present in the area of the shooting, as were 31 Hyde Street residents Leon Delima and Shelly Sanders. After the shooting, Defendant and Mr. Delima fled the scene and were later detained. Defendant was subsequently identified as an associate of the victim.

Realizing that he had left his audio recording device in his vehicle, Lieutenant Warren went back to retrieve it. While doing so, he called Detective Jeffrey Beerworth, the lead investigator of the drive-by shooting, who advised that Quincy Alexander fled from the scene of the December 27, 2015 homicide on Church Street and that some of the individuals living at 31 Hyde Street had also been present at that homicide. With his audio recorder concealed in a notebook, Lieutenant Warren returned to the Ford Escape and recorded the remainder of the encounter in the Macy's garage.

When the BPD officers called in Defendant's identification, they were advised that his operator's license was civilly suspended. They also learned from their conversation with Defendant that he had previously missed a court appearance and a bench warrant

---

the court credits the testimony of Defendant's state public defender who met with Defendant both before and during the police encounter that she did not smell marijuana on his clothing or person, Defendant admitted smoking marijuana prior to his encounter with BPD.

4

had issued for his arrest but was apparently vacated that morning when Defendant appeared in court. Because the presiding judge could not address his appearance in the morning, Defendant was told to come back to court in the afternoon. The BPD officers were aware that Defendant was facing a state court charge for providing false information to a police officer.

When asked about the odor of marijuana, Defendant admitted that he had smoked marijuana that morning to "take the edge off" his court appearance. Defendant further explained that he was from New York and had arrived in Vermont with his girlfriend a few days earlier and was staying at the Motel 6 in Colchester, Vermont. He stated he came to Vermont in order to clear up the bench warrant and some tickets and to obtain "bud" which the BPD officers credibly testified is a slang term for marijuana. Defendant advised that the Ford Escape was a rental vehicle and that his girlfriend, Elena Roberts, a public defender, had rented it for him to take to Vermont. Defendant used his cell phone to call Ms. Roberts so that she could speak to Sergeant Petralia. When Sergeant Petralia asked if she was in Vermont, Ms. Roberts advised him that she was in New York City and that Defendant had come up to Burlington the previous night to address some traffic violations. She confirmed that neither she nor Defendant consented to a search of the Ford Escape.

After concluding his phone call with Ms. Roberts, Sergeant Petralia and Lieutenant Warren confronted Defendant regarding his inconsistent statements with respect to when he came to Vermont and with whom. In response, Defendant attempted to explain his relationship with Ms. Roberts, claiming she was his girlfriend and then claiming she was his wife and further explaining that he had another girlfriend named Erin from Winooski, Vermont. When the BPD officers asked Defendant about the two cell phones in the Ford Escape, he claimed that one phone was an old phone that only played music. The officers, however, observed the "old phone" receiving incoming calls.

Throughout the encounter, Defendant continued to decline consent to search the Ford Escape and further declined consent to allow the officers to swab his hands for

5

gunshot residue. He, however, confirmed that he had been in Burlington the previous evening and that no one else had keys to the Ford Escape.

The BPD officers' interview with Defendant lasted slightly more than one hour. The tone of the interview was consistently conversational in nature. The officers did not raise their voices, threaten Defendant, or make any display of force. Defendant joked with the BPD officers that they had adopted a "good cop/good cop" style of questioning. (Ex. 6d at 51:13.) With the exception of the pat down, the BPD officers neither physically touched nor restrained Defendant until the conclusion of their interview whereupon they placed Defendant in handcuffs and detained him in a squad car.

Because they could not safely tow the Ford Escape from the Macy's garage,[3] a BPD officer drove it to the station where a drug-detection canine alerted to the presence of illegal narcotics. Lieutenant Warren credibly testified that he did not know whether the currency he saw on the driver's side floor of the vehicle was moved en route.

Detective Beerworth applied for and obtained a search warrant from a Vermont Superior Court judge for a maroon/red 2015 Ford Escape bearing Illinois registration P862221 and belonging to Quincy Alexander. The affidavit he prepared in support of the warrant application does not mention BPD's decision to drive the Ford Escape from the Macy's garage to the BPD station. Based on the chronology of events, the affidavit creates a reasonable inference that the canine sniff of the Ford Escape took place in the Macy's garage when in fact it took place at BPD, although it contains no affirmative misrepresentation to that effect. The search yielded, among other evidence, marijuana and crack cocaine in the vehicle's center console, currency in the center console and driver's door, and firearms and ammunition in the rear hatch and in back of the passenger seat.

---

[3] A flat bed tow truck was incapable of entering the Macy's garage. Although a tow truck was available, Lieutenant Warren credibly testified that he believed that towing an all-wheel-drive vehicle with its wheels up would damage the vehicle.

## II. Conclusions of Law and Analysis.

Defendant does not challenge the search warrant on the basis of either a lack of probable cause or on the basis of false and material misrepresentations pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Instead, he seeks the suppression of the evidence obtained as the fruits of his unlawful detention and arrest in the Macy's garage. The government does not contest Defendant's standing to challenge the search of the Ford Escape rental car on that basis.[4]

### A. The Nature of the Encounter in the Macy's Garage.

The Fourth Amendment guarantees the right of the people "against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "[T]here are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992). "The first type is a consensual encounter whereby an individual willingly agrees to speak to law enforcement personnel. Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a seizure" under the Fourth Amendment. *Id.* (internal quotation marks and citations omitted).

The second type of encounter is "a limited investigative stop" pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) which must be justified by "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Id.* (internal quotation marks omitted). "[S]uch investigative detentions are 'seizures' under the Fourth Amendment[.]" *Id.* To conduct such a stop, the officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

---

[4] Although a rental agreement was among the items recovered in the search, it is unclear whether Defendant was authorized to operate the 2016 Ford Escape or whether only Ms. Roberts was authorized to do so. Defendant's license was civilly suspended at the time. The Second Circuit recently held that a driver not contractually authorized to operate a rental vehicle whose license is suspended has no reasonable expectation of privacy in the vehicle because his or her "use of the rental car was both unauthorized *and* unlawful." *United States v. Lyle*, 856 F.3d 191, 201 (2d Cir. 2017).

7

Finally, there is an arrest, which "must be based on probable cause." *Glover*, 957 F.2d at 1008. "An officer has probable cause to arrest when in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

In determining whether a seizure has occurred and, if so, what type, the courts consider:

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (internal quotation marks omitted); *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.'").

In this case, Sergeant Petralia and Lieutenant Warren approached the Ford Escape on either side which may have prevented Defendant from exiting his vehicle, but would presumably not have prevented his vehicle from exiting the Macy's garage. *See Drayton*, 536 U.S. at 204 (noting that whether a seizure occurs depends in part on whether there was a "blocking of exits"); *United States v. Allen*, 2014 WL 2327315, at *5 (D. Vt. May 29, 2014) (observing that a seizure may result when "[t]he agents stood on either side of the vehicle, which effectively blocked the vehicle's occupants from exiting it without the agents' acquiescence"), *aff'd*, 632 F. App'x 20 (2d Cir. 2016). The BPD officers were dressed in plain clothes and arrived at the garage in unmarked vehicles. Even without a reasonable suspicion of criminal activity, they were entitled to approach Defendant's vehicle, ask for identification, and ask questions. *See Drayton*, 536 U.S. at 200 ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and

8

putting questions to them if they are willing to listen."); *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions" and holding a police officer may "ask to examine the individual's identification" provided "the police do not convey a message that compliance with their requests is required.").

Sergeant Petralia's "identifi[cation of] himself as a police officer, without more, [also did not] convert the encounter into a seizure requiring some level of objective justification." *Florida v. Royer*, 460 U.S. 491, 497 (1983). However, when Sergeant Petralia displayed his badge and directed Defendant to roll down his windows, the encounter was arguably no longer purely consensual. A person may be seized "when an individual's submission to a show of governmental authority takes the form of passive acquiescence," *Brendlin v. California*, 551 U.S. 249, 255 (2007), and "a reasonable person would [not] feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436.[5]

If a police encounter is not consensual, "the amount of suspicion needed to justify [a *Terry* stop] is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *United States v. Padilla*, 548 F.3d 179, 186-87 (2d Cir. 2008) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Here, that standard was easily satisfied.

---

[5] Whether the defendant actually submitted to the show of authority is also relevant. *Compare United States v. Ingram*, 151 F. App'x 597, 599 (9th Cir. 2005) (reversing denial of suppression motion because a reasonable person in defendant's position who is approached by an armed and uniformed officer who directs him to roll down his windows "would not feel free to ignore the command" and is therefore seized and holding "[a]bsent reasonable suspicion justifying the seizure, a Fourth Amendment violation occurred."), *with United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005) (holding "seizure" did not occur when uniformed police officer approached a vehicle parked in an alley behind a shopping mall with his hand on his firearm, shined a flashlight into the vehicle, and knocked on vehicle's window which passengers initially ignored and "went about their business" until they rolled down the window to see what police officer wanted). This is because "there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citation omitted).

9

Although the Ford Escape's model year differed by one year from the eyewitness's description, this slight discrepancy does not outweigh the numerous points of similarity between the two vehicles including make, model, color, tinted windows, and out-of-state plates. *See United States v. Abdus-Price*, 518 F.3d 926, 928 (D.C. Cir. 2008) (holding that the target of a *Terry* stop cannot "defeat the legality of his seizure by pointing to a slight color discrepancy between the car in which he was traveling and a crime victim's description of the vehicle . . . so long as the remaining points of similarity support a reasonable suspicion that the target was involved in criminal activity"). The match between the BOL vehicle and Defendant's rental car was further enhanced by the close temporal and geographic proximity between the drive-by shooting and the location of Defendant's vehicle in the Macy's garage. *See United States v. Breckenridge*, 400 F. Supp. 2d 434, 442 (D. Conn. 2005) (finding that officer had reasonable suspicion to stop vehicle where it matched the description of suspect's vehicle and the stop was conducted in close geographic and temporal proximity to the alleged crime). When the officers approached Defendant's Ford Escape they therefore possessed a reasonable suspicion that the vehicle, and potentially its operator, had been involved in the previous evening's drive-by shooting.

Because they had a reasonable suspicion of criminal activity, the BPD officers were entitled to exert a minimal restraint on Defendant's freedom of movement by directing him to roll down his vehicle's windows in order to investigate further. *See Royer*, 460 U.S. at 500 ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."). The BPD officers were further entitled to ask Defendant to exit his vehicle and pat him down for weapons. *See Brendlin*, 551 U.S. at 258 ("In *Maryland v. Wilson*, 519 U.S. 408 [] (1997), we held that during a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk."); *Terry*, 392 U.S. at 27 (authorizing a brief search for weapons "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has

probable cause to arrest the individual for a crime"); *Padilla*, 548 F.3d at 187 (noting that the purpose of a pat down "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence") (internal quotation marks omitted).[6]

Because the totality of the circumstances supported further investigation under *Terry*, Defendant's motion to suppress on the basis that he was seized without reasonable suspicion of criminal activity in violation of the Fourth Amendment is DENIED.

### B. Whether Defendant's Arrest Was Supported by Probable Cause.

Defendant maintains that his continued detention amounted to a *de facto* arrest without probable cause. "A permissible investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).

In the instant case, for a little over an hour, Defendant stood outside his rental vehicle in a public parking garage and spoke in a conversational manner with two police officers in plain clothes with holstered firearms. During the encounter, he was permitted to call Ms. Roberts on his cell phone and he arranged for Sergeant Petralia to speak with her as well. It is unclear whether the BPD officers retained his identification or returned it to him. It is uncontroverted, however, that Defendant was not subjected to displays or

---

[6] Because reasonable suspicion existed to support the pat down, the court need not address the government's contention that the pat down was consensual. *See United States v. Jenkins*, 2015 WL 1467691, at *7 (D. Vt. Mar. 30, 2015) ("The court does not need to decide whether the patdown was consensual because it was lawful as part of the *Terry* stop even without Jenkins' consent.").

11

threats of force. After the pat down, he was neither physically touched nor otherwise restrained until the conclusion of the encounter. *See United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982) ("In determining whether a particular restraint is an arrest[,] . . . the degree of restraint must be analyzed. When no formal arrest has been made, . . . courts have considered the amount of force used by the police, the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained."); *United States v. Redick*, 2006 WL 908153, at *6 (D. Conn. Apr. 5, 2006) (holding that a "*Terry* stop was not transformed into an arrest until after police seized the gun from [defendant's] waistband" and observing that law enforcement did not "handcuff him or force him to the ground until after the discovery of the firearm"). Defendant was neither told he was under arrest, nor threatened with arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 441-42 (1984) (holding that defendant was not subjected to "the functional equivalent of formal arrest" where "[a]t no point during the [period between his initial stop and his arrest] was [he] informed that his detention would not be temporary" and the detaining officer "never communicated his intention" to take defendant into custody). The nature and circumstances of the encounter remained investigative rather than custodial until Defendant was finally placed under arrest.[7]

As soon as Defendant rolled down his vehicle's windows, the BPD officers encountered the strong odor of burnt marijuana. That odor alone provided probable cause to search Defendant's vehicle. *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."); *United States v. Trapp*, 2014 WL 1117012, at *11 (D. Vt. Mar. 20, 2014) ("The smell of marijuana provides probable cause to search a vehicle."). At the very least, the BPD officers were entitled to detain Defendant in order to investigate further. *See*

---

[7] Although Defendant does not identify precisely when he believes he was arrested, handcuffs "[u]nder ordinary circumstances . . . are not part of a *Terry* stop[.]" *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (internal quotation marks omitted); *see also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.").

12

*Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010) (stating that "the smell of marijuana alone may provide a basis for reasonable suspicion for further investigation of possible criminal conduct"); *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (observing that "the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause.").

In addition to the strong odor of burnt marijuana, Lieutenant Warren observed a large amount of currency in the Ford Escape near Defendant's feet and a cell phone which Defendant falsely claimed could only be used for music. The officers also knew that the vehicle was a rental vehicle and that Defendant's operator's license was suspended. *See United States v. Avezov*, 731 F. Supp. 2d 1194, 1204 (N.D. Okla. 2010) (noting that "[t]he status of a vehicle as a [rental] can be considered a factor to support the existence of reasonable suspicion, because it is accepted that drug traffickers frequently use rental vehicles to transport illegal drugs"). In addition, Defendant either was recently or currently the subject of a bench warrant arising out of a charge of providing false information to a police officer.

In the course of the encounter, Defendant provided inconsistent and contradictory information regarding when and with whom he had come to Vermont. *See United States v. Hooper*, 935 F.2d 484, 494 (2d Cir. 1991) (concluding that "confused and contradictory responses" to officers' questions combined with nervous demeanor and lack of identification gave rise to reasonable suspicion of criminal activity). He, however, admitted that he was in Vermont to obtain marijuana and acknowledged he had been smoking it earlier that day.

More importantly, Defendant confirmed that he was in Vermont on the night of the drive-by shooting and that no one else had possession of his car keys. The BPD officers rapidly established a connection between Defendant and some of the occupants of unit #6 who appeared to be the targets of the drive-by shooting. They also confirmed

13

that Defendant was present during a fatal shooting on Church Street approximately nine months prior and was a known associate of the shooting victim.

Based on the totality of the circumstances, the BPD officers had probable cause to arrest Defendant even if they did not know the precise charges that would be brought against him or whether a prosecution would be successful. *See Ramirez v. Port Auth. of N.Y. & N.J.*, 2015 WL 9463185, at *5 (S.D.N.Y. Dec. 28, 2015) (commenting that "[t]he precise charges and possible defenses do not need to be known at the time of arrest" to establish probable cause); *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (noting that "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful") (internal quotation marks omitted). The search warrant that issued after Defendant's arrest was therefore free from the taint of a Fourth Amendment violation.

Finally, not only was the search of Defendant's rental vehicle authorized by a search warrant supported by probable cause, but law enforcement could have searched it even without the benefit of a warrant. *See California v. Acevedo*, 500 U.S. 565, 580 (1991) (holding that "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained"); *California v. Carney*, 471 U.S. 386, 390-91 (1985) (explaining that the "automobile exception" to the "general rule that a warrant must be secured before a search is undertaken" is based upon an automobile's "ready mobility" and the "lesser expectation of privacy resulting from its use").

Viewed in their totality, the facts and circumstances established probable cause for Defendant's arrest and probable cause to search the vehicle in which he was seated when the BPD officers encountered him.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress. (Doc. 16.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 30th day of June, 2017.

_____
Christina Reiss, Chief Judge
United States District Court