U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 APR 19 PM 12: 42

CLERK
BY [signature]
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,  )
)
v.  ) Case No. 2:16-cr-00141-1
)
QUINCY ALEXANDER,  )
)
Defendant.  )

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS PURSUANT TO
THE FIFTH AMENDMENT AND *MIRANDA v. ARIZONA***
(Doc. 47)

Pending before the court is Defendant Quincy Alexander's motion to suppress statements obtained in the course of a September 29, 2016 interview by Burlington Police Department ("BPD") Sergeant Paul Petralia and Lieutenant Michael Warren in a mall parking garage (Doc. 47). Defendant argues that he was subjected to custodial interrogation without the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The government opposes the motion.

The court held an evidentiary hearing on March 9, 2018, at which both BPD officers testified. Without objection, the court also considers the evidence presented during evidentiary hearings held on April 11, 2017 and May 1, 2017 with regard to Defendant's initial motion to suppress.[1]

The government is represented by Assistant United States Attorneys John J. Boscia and Michael P. Drescher. Maryanne E. Kampmann, Esq. represents Defendant.

I.  **Findings of Fact.**

Based upon the preponderance of the evidence, the court finds as follows. On September 28, 2016, at approximately 5:00 p.m., BPD officers responded to a report of a drive-by shooting at a multi-unit residence located at 31 Hyde Street in Burlington,

---

[1] As the government notes, the court has made factual findings relevant to Defendant's claim that he was in custody during his BPD interview which Defendant has not challenged.

Vermont. Witnesses reported seeing an African-American male with a large build making cell phone calls outside the building immediately prior to the shooting.

Officers subsequently found three bullet holes in the 31 Hyde Street building, one penetrating the front door of unit #7 on a trajectory towards unit #6, one lodged in an interior wall also on a trajectory towards unit #6, and a third in a second floor wall, just inches from an unoccupied crib where an infant usually slept. The trajectory for the third bullet also passed in close proximity to unit #6. There were no reported injuries. BPD officers identified the occupants of unit #6 as Darren McCray, Shelly Sanders, Leon Delima, David Rosario, and Chelsea Barber. They were aware of two recent assault and robberies at unit #6.

A female who lived across the street from 31 Hyde Street stated that she had witnessed the drive-by shooting and that three to four gunshots were fired from the passenger side of a maroon colored 2015 Ford Escape with tinted windows. Through a partially lowered driver's side window she saw a male operator of unknown age and race before the vehicle left the scene. Because she worked in the automotive industry, she advised that she was very sure of the make, model, and year of the vehicle. She was also certain the vehicle did not have Vermont license plates, but she was less certain of the issuing state. She stated that the vehicle's out-of-state "colored" plates may have been from either Pennsylvania or New York. In response to her report, BPD disseminated a "be on the lookout" for a vehicle matching the description she provided which included a "stop and hold" instruction requesting law enforcement officers who encountered a vehicle matching the description to detain the vehicle until BPD could investigate.

On the morning of September 29, 2016, BPD held a briefing at which the "be on the lookout" and details of the drive-by shooting were disseminated to BPD officers. Detective Dwayne Mellis was among the BPD officers tasked with canvassing local hotel parking areas, mall parking lots, and parking garages for a vehicle matching the description. On the same day of the briefing, he located a vehicle that appeared to be a match on the second level of a parking garage attached to a mall that included a Macy's department store (the "Macy's garage"). The vehicle in question was a maroon Ford

Escape with rear tinted windows and Illinois plates. Detective Mellis called BPD dispatch for a records check and determined that the vehicle was a 2016 Ford Escape registered to Hertz Rental Car. Although the vehicle was unoccupied when he first discovered it, he later observed an African-American male enter the vehicle. He contacted BPD Sergeant Paul Petralia to report the apparent vehicle match and to advise him of the Illinois plate number, and then left his location to continue his canvass.

Sergeant Petralia proceeded to the Macy's garage dressed in plain clothes and carrying a holstered firearm which was concealed by his untucked shirt. He arrived in an unmarked vehicle and parked a short distance away from the Ford Escape which was parked nose-in facing a guardrail. Sergeant Petralia ran the vehicle's plate number and determined that it belonged to a rental company. He noted that a male was seated in the driver's seat. He conferred with BPD Lieutenant Michael Warren by cell phone and they formulated a plan to make contact with the operator after Lieutenant Warren arrived on the scene.

Minutes later Lieutenant Warren arrived in an unmarked vehicle at the Macy's garage dressed in plain clothes with a holstered and concealed firearm. For safety reasons, he and Sergeant Petralia decided to approach on either side of the Ford Escape with Sergeant Petralia approaching the passenger side while Lieutenant Warren approached the driver's side. When he reached the vehicle, Sergeant Petralia knocked on the passenger-side window and displayed his badge. In response, Defendant rolled down the vehicle's windows, whereupon both Sergeant Petralia and Lieutenant Warren smelled the strong odor of burnt marijuana. From his vantage point, Lieutenant Warren observed a large pile of currency on the driver's side floor near Defendant's feet and two cellphones, one in Defendant's hand and the other on the passenger's seat.

Lieutenant Warren asked Defendant if he would mind speaking to them outside the vehicle and Defendant exited the Ford Escape. Once outside the vehicle, Lieutenant Warren asked Defendant if he could pat him down for weapons. Defendant appeared surprised by the request, raised his hands in the air, and said something to the effect of "wow, okay." No weapons or contraband were detected on his person. After exiting the

3

vehicle, Defendant stood with both officers between the Ford Escape's driver side door and another parked vehicle. As the interview progressed, Defendant and the officers moved as vehicles entered and exited the garage in their vicinity.

The BPD officers asked Defendant for identification and he produced a New York operator's license identifying him as "Quincy Alexander." Sergeant Petralia could not recall how long he kept Defendant's identification, or whether he returned it immediately after checking it. Almost immediately, he recognized Defendant's name as being associated with a December 27, 2015 fatal shooting on Church Street in Burlington. Defendant was present in the area of the shooting, as were 31 Hyde Street residents Leon Delima and Shelly Sanders. After the shooting, Defendant and Mr. Delima fled the scene and were later detained. Defendant was subsequently identified as an associate of the victim. Lieutenant Warren also recognized Defendant's name in association with the 2015 Church Street shooting. Lieutenant Warren attempted to alert Sergeant Petralia to the connection, and Sergeant Petralia responded to the effect of "yeah I understand as well."

Realizing that he had left his audio recording device in his vehicle, Lieutenant Warren went back to retrieve it. While doing so, he called Detective Jeffrey Beerworth, the lead investigator of the drive-by shooting. Detective Beerworth informed him that Quincy Alexander fled from the scene of the 2015 Church Street shooting and that some of the individuals living at 31 Hyde Street had also been present at the scene. With his audio recorder concealed in a notebook, Lieutenant Warren returned to the Ford Escape and recorded the remainder of the encounter in the Macy's garage.

When the BPD officers called in Defendant's identification, they were advised that his operator's license was civilly suspended. Defendant related that he had previously missed a court appearance and a bench warrant had issued for his arrest but was apparently vacated that morning when he appeared in court. Because the presiding judge could not address his appearance in the morning, Defendant was told to come back to court in the afternoon. The BPD officers were aware that Defendant was facing a state court charge for providing false information to a police officer.

4

When asked about the odor of marijuana, Defendant admitted that he had smoked marijuana that morning to "take the edge off" his court appearance. Defendant further explained that he was from New York and had arrived in Vermont with his girlfriend a few days earlier and was staying at the Motel 6 in Colchester, Vermont. He stated he came to Vermont in order to clear up the bench warrant and some tickets and to obtain "bud" which the officers understood was a reference to marijuana.

Defendant advised that the Ford Escape was a rental vehicle and that his girlfriend, Elena Roberts, an attorney who worked as a public defender, had rented it for him to take to Vermont. Informing Defendant that "she can come by if she wants[,]" Ex. 7 at 3 (Sep. 29, 2016), Sergeant Petralia stood next to Defendant while he used his cellphone to call Ms. Roberts. After Defendant spoke with Ms. Roberts, he handed the phone to Sergeant Petralia so that Ms. Roberts could speak to him. Ms. Roberts informed Sergeant Petralia that she was in New York City and that Defendant had come up to Burlington the previous night to address some traffic violations. She confirmed that neither she nor Defendant would consent to a search of the Ford Escape. Sergeant Petralia responded that BPD would "certainly" respect her decision. *Id.* at 6.

Shortly after Defendant concluded his first call to Ms. Roberts, Lieutenant Warren advised Defendant that he was not under arrest. He explained that the officers were investigating a shooting, they had some questions for Defendant regarding his possible involvement, and as soon as the questioning was complete they could "get [Defendant] on [his] way" and be on their way themselves.[2] *Id.* at 11.

---

[2] The exchange took place as follows:

> **Defendant** [on phone]: So, he said he wants to finish talking to me, babe, about I don't know.
>
> **Lieutenant Warren:** It's just going to be quick.
>
> **Defendant:** I'm listening. I'm listening. They, they, they giving me two seconds. I'm listening.
>
> **Lieutenant Warren:** No, no, no. It's going to be quick, and then we will be out of here. You can call her back in a few minutes. Tell her you'll call her back in a few minutes.
>
> (Background noise)

5

In the course of their interview, the BPD officers confronted Defendant regarding his inconsistent statements with respect to when he came to Vermont and with whom. In response, Defendant attempted to explain his relationship with Ms. Roberts, claiming she was his girlfriend and then claiming she was his wife (although he conceded they were not married) and further explaining that he had another girlfriend named Erin from Winooski, Vermont. When the BPD officers asked Defendant about the two cell phones in the Ford Escape, he claimed that one phone was an old phone that only played music. The officers, however, observed the "old phone" receiving incoming calls. As Defendant continued to provide inconsistent information, the officers expressed their concerns and intimated that Defendant was under suspicion:

> **Lieutenant Warren:** Here – here's my concern, okay? A houseful of guys got shot up yesterday.
>
> **Defendant:** Whoa.
>
> **Lieutenant Warren:** That were also at that incident when your boy died [the 2015 Church Street shooting].
>
> **Defendant:** Whoa.
>
> **Lieutenant Warren:** Okay? Now we're talking to you. You're driving the car that matches the description given by a completely independent

---

> **Defendant:** All right, babe. All right, babe. All right, baby, all right, all right.
>
> (Off the phone)
>
> **Lieutenant Warren:** Okay. So, listen – and again, like I said, I know you probably haven't had the greatest encounters with the cops in the past. Like, I get all that. You know, we're reasonable guys. We're just trying to figure this thing out, okay? You're not under arrest. Okay? We're just trying to – we, we, we noticed your car. It matches a car we're looking for, and we just had a couple questions we wanted to just – you know, so that we can get you on your way.
>
> **Defendant:** Well –
>
> **Lieutenant Warren:** And we can be on our way.
>
> **Defendant:** What do you want me to do?
>
> **Lieutenant Warren:** We just want, we just want to, you know, talk to you a little bit more about, you know, like the circumstances around you being in Vermont, not the, not the court stuff but just –

Ex. 7 at 10-11 (Sep. 29, 2016).

6

witness. And you're lying to us about, like, you know, some circumstances.

Ex. 7 at 34 (Sep. 29, 2016).

In a similar vein, Lieutenant Warren told Defendant that he did not believe Defendant was telling the truth, stating at one point that "things aren't adding up, buddy[,]" *id.* at 5, and telling Defendant "it's our job to figure out if the reason that you're lying to us is because you just don't like us, or the reason you're lying to us is because you're hiding something." *Id.* at 31-32. The BPD officers further advised Defendant of the need to be truthful, at one point telling him "the more you lie about things that don't matter, the more suspicious we get[.]" *Id.* at 12. Lieutenant Warren also employed a ruse, suggesting that a license plate reader may have registered the Ford Escape's license plate in Burlington, Vermont while Defendant claimed to have been in Williston, Vermont. Defendant subsequently admitted he had come into Burlington on the day of the drive-by shooting to obtain marijuana.

The BPD officers emphasized that they were not concerned with Defendant's use or possession of marijuana, and told him they would not issue a ticket for it. Thereafter, Defendant asked the officers to "take me into court. . . . I have a [b]ench [w]arrant. . . . Take me [indiscernible], like I[,] I'm not trying to threaten you guys or anything." *Id.* at 56-57. Lieutenant Warren asked if Defendant objected to his making a telephone call to the lead investigator to see if he had any more questions before the officers let Defendant leave. Defendant responded that Lieutenant Warren did not need his permission and appeared affronted by the suggestion that he did. At one point in the encounter, Sergeant Petralia and Lieutenant Warren attempted to joke with Defendant, stating that they were utilizing a "good cop/good cop" strategy. *Id.* at 51.[3]

---

[3] The parties agree that Defendant did not actually endorse the officers' good cop/good cop description of the conversation and that the transcript of Defendant's interview is inaccurate in this respect. The correction, however, is immaterial because Sergeant Petralia clarified that he was only making a joke. *See* Ex. 7 at 51 (Sep. 29, 2016) ("**Sergeant Petralia:** You know I'm kidding. You know I'm kidding, right?").

7

Defendant answered some of the officers' inquiries regarding his whereabouts and purpose for being in Vermont, and freely expressed his frustration with other questions. In addition to answering questions, he asked the BPD officers questions primarily directed to the grounds for their suspicions. Towards the end of the interview, Defendant placed a second call to Ms. Roberts after the BPD officers sought his consent to swab his hands for gunpowder residue and test his clothing for additional forensic evidence. Lieutenant Warren explained that Defendant could refuse consent, and that if he did so the officers would seek a Forthwith Non-Testimonial Order that if granted would compel Defendant to provide the evidence. He further explained that they would detain Defendant while they sought the Order. Defendant refused consent and was subsequently arrested.

The BPD officers' interview with Defendant lasted slightly more than one hour. The tone of the interview was consistently conversational in nature with all participants adopting a colloquial tone and freely using profanity. The BPD officers did not raise their voices, physically or verbally threaten Defendant, state that they intended to arrest Defendant, or make any display of force. With the exception of the pat-down, the officers neither physically touched nor restrained Defendant until the conclusion of their interview when they placed him in handcuffs.

## II. Conclusions of Law and Analysis.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. To effectuate this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This is because "custodial police interrogation, by its very nature, isolates and pressures the individual[] . . . [and] 'exacts a heavy toll on individual liberty and trades on the weakness of individuals[,]'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000)

8

(quoting *Miranda*, 384 U.S. at 455), thus raising "increased concern about confessions obtained by coercion." *Id.* at 435-36 (footnote omitted).

An individual must be subjected to custodial interrogation before *Miranda*'s protections apply. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.").[4] An individual is in custody for the purposes of *Miranda* only when two conditions are satisfied:

> [t]he test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."

*United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). As the Second Circuit has recently observed:

> While the first condition – a seizure – is necessary for concluding that a suspect was in custody, "not every seizure constitutes custody for purposes of *Miranda*." Thus, the "ultimate inquiry" is whether a reasonable person would have understood the law enforcement agents' restraint on his freedom to equal "the degree associated with a formal arrest."

*United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) (footnote omitted) (quoting *Newton*, 369 F.3d at 370, 372). In making this determination, the Second Circuit has offered a non-exhaustive list of factors to be considered:

> Relevant considerations include: (1) the interrogation's duration; (2) its location (e.g., at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Faux*, 828 F.3d at 135 (internal quotation marks omitted). In addition to these factors, courts consider whether the police "'affirmatively convey the message that the defendant

---

[4] The parties appear to agree that Defendant's interview was an "interrogation" within the meaning of *Miranda*.

9

is not free to leave,'" *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (quoting *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992)), "or that he is 'completely at the mercy of the police.'" *Id.* (quoting *Newton*, 369 F.3d at 675). However, "[a]n individual's subjective belief about his or her status generally does not bear on the custody analysis[,]" *Faux*, 828 F.3d at 135, nor does "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed[.]" *Stansbury v. California*, 511 U.S. 318, 324 (1994).

Defendant argues that he was "in custody" while in the Macy's garage because his freedom of movement was constricted when the two police officers approached on both sides of his car, knocked on his car window, displayed their badges, asked him to exit the vehicle, and patted him down for weapons. After that show of authority, he contends that his ability to leave the interview was wholly dependent on his answering questions to the officers' satisfaction.

There are some facts that support a conclusion that a reasonable person in Defendant's circumstances would not feel free to leave or terminate the interview.[5] The officers never left Defendant alone, interviewed Defendant about two serious crimes, repeatedly expressed their belief that Defendant was not being truthful, and interposed some limits on the duration of one of his cellphone calls. In addition, Lieutenant Warren indicated that he wanted to check with his supervisor before he "let [Defendant] go." Ex. 7 at 59 (Sep. 29, 2016).

On the other hand, during the entirety of the interview, Defendant was in a public place with vehicles entering and exiting close by. *See United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) (observing that "[l]ower courts rarely find custody where interrogation is conducted outside a police station or vehicle"). He was advised he was not under arrest and the officers suggested that both they and he would soon be "on

---

[5] The uncertain status of the outstanding bench warrant is a confounding factor as all parties acknowledged that Defendant was not free to ignore it. When asked about his presence in Vermont, Defendant stated: "I'm really just trying to take care of that Ticket, so I can get this Bench Warrant off my fucking ass." Ex. 7 at 53 (Sep. 29, 2016). The officers, in turn, advised Defendant that he needed to get it "straightened out." *Id.* at 54.

[their] way." Ex. 7 at 10-11 (Sep. 29, 2016). Any undisclosed intent or plan to the contrary is immaterial because an officer's subjective intentions affect the analysis "only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325.

The police officers were dressed in plain clothes and their weapons were concealed. During the course of the interview, Defendant made two phone calls with his own cellphone. *See Rakowski*, 714 F. Supp. at 1335 (noting that "defendant was allowed to make two phone calls" while concluding that defendant was not in custody for purposes of *Miranda*). The interview was relatively brief in duration, *see Schaffer*, 851 F.3d at 174 (finding a defendant was not in custody where "the interview lasted only about an hour"), and consistently conversational in nature.[6] Defendant asked questions as well as answered them, declined to answer questions as he saw fit, refused consent to search his rental vehicle and submit to gun powder residue testing of his hands, and expressed an awareness of his constitutional rights. *See, e.g.*, Ex. 7 at 44 (Sep. 29, 2016) ("I don't need you guys to violate me or my rights.").

Lieutenant Warren asked Defendant's permission to leave to make a phone call and assured Defendant that the officers were "trying to be respectful[,]" *id.* at 45, while Sergeant Petralia tried to joke with Defendant. *Cf. United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984) (observing that a "tone indicating a show of authority that may compel compliance with the officer's request" is a factor supporting a finding of custody).

Encouraging Defendant to tell the truth, without more, does not render the questioning custodial in nature. *See Mitchell*, 966 F.2d at 99 (noting that an

---

[6] Defendant rebuffed any suggestion that he was involved in either of the two crimes discussed. *See, e.g.*, Ex. 7 at 17 (Sep. 29, 2016) ("**Defendant:** I know. You're making me seem like I'm telling you the wrong thing though. You cut me off. **Lieutenant Warren:** Okay . . . I'm sorry."). When asked about his involvement with the drive-by shooting, he responded: "I ain't got shit to do with the shit they fucking with." *Id.* at 9. Similarly, when asked about the involvement of one of his friends, he replied that his friend "didn't do shit." *Id.* at 24. When asked if he knew a person of interest in the 2015 Church Street shooting, Defendant answered that "I don't know . . . who the fuck that is." *Id.* at 37.

11

"admonition" "not to lie" does not "tend[] to establish any indication by [an interviewing officer] that [the defendant] was not free to leave or terminate the interview."). Likewise, the officers' brief pat-down search of Defendant after he exited the rental vehicle at the outset of the interview was a permissible part of an investigative stop that did not place Defendant in custody.[7]

As the Supreme Court has recognized, almost all investigatory detentions have some element of coercion to them. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."). Although a reasonable person in Defendant's circumstances may not have felt fully free to leave or terminate the interview, "[n]ot all seizures amount to 'custody'; a seizure is a necessary, but not sufficient, condition." *Faux*, 828 F.3d at 135. "The 'ultimate inquiry' for determining *Miranda* custody . . . is that articulated by the Supreme Court in *California v. Beheler*: 'whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Newton*, 369 F.3d at 670 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "[I]n the absence of any formal arrest or restraint on freedom of movement[,]" *Miranda* warnings are not required. *Id.* at 671.

In this case, there is no evidence that Defendant was subjected to a restraint on his freedom of movement to the degree of a formal arrest. Defendant was not handcuffed,

---

[7] *See United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016) ("we have repeatedly held that a pat-down search does not establish custody for *Miranda* purposes."); *United States v. Pelayo-Ruelas*, 345 F.3d 589, 593 (8th Cir. 2003) (concluding that a "pat down search" performed after asking a suspect to exit his vehicle was "a rather routine component of a *Terry* stop" which "did not restrain [the defendant's] movement to the degree associated with an arrest."); *United States v. Sinclair*, 983 F.2d 598, 603 (4th Cir. 1993) (finding defendant's "contention that [a] pat-down search escalated the encounter into an arrest . . . unpersuasive."); *United States v. Vigil-Montanel*, 753 F.2d 996, 997 (11th Cir. 1985) (finding "a routine pat-down search" at an airport security check-point non-custodial); *United States v. Pratt*, 645 F.2d 89, 91 (1st Cir. 1981) (holding that a "pat-down" was "insufficient to push the circumstances into 'custodial interrogation.'").

physically restrained, or even touched beyond the brief pat-down at the commencement of the interview. *See Newton,* 369 F.3d at 676 (holding that handcuffs are "generally recognized as a hallmark of a formal arrest"). He was informed that he was not under arrest and he was not threatened with an arrest. *See United States v. Badmus,* 325 F.3d 133, 139 (2d Cir. 2003) (finding pre-arrest statements non-custodial where law enforcement "informed the defendant and his wife that they were not under arrest"). No weapons were drawn or displayed at any time during the interview; there was no physical or verbal show or threat of force. *See United States v. Vado,* 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (remarking that FBI "agents' weapons were not drawn" while determining that defendant was not in custody); *United States v. Weisinger,* 2012 WL 6164306, at *7 (D. Vt. Dec. 11, 2012) (finding defendant not in custody where "detectives did not display their sidearms or otherwise use or threaten force against Defendant.").

"The [*Miranda*] rule exists to temper the 'potentiality for compulsion' that exists when an individual is 'cut off from the outside world' and subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere.'" *United States v. FNU LNU,* 653 F.3d 144, 154 (2d Cir. 2011) (quoting *Miranda,* 384 U.S. at 445); *Newton,* 369 F.3d at 671 ("*Miranda*'s animating concern was coercive interrogation techniques"). Those circumstances are not present here.

Based on the totality of the circumstances, a reasonable person in Defendant's position would not have felt that his or her freedom of movement was curtailed to the degree commensurate with a formal arrest. Defendant was therefore not in custody for purposes of the Fifth Amendment during the BPD interview, and *Miranda* warnings were not required.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress his pre-arrest statements as obtained in violation of his rights under the Fifth Amendment and *Miranda v. Arizona* is DENIED (Doc. 47).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of April, 2018.

Christina Reiss, District Judge
United States District Court